IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEITH RAWLINGS : | |
|      **Plaintiff,** : | |
| : | Civil Action |
| v. : | No. 2:19-CV-04698 |
| : | |
| : | |
| SOUTHEASTERN PENNSYLVANIA : | |
| TRANSPORTATION AUTHORITY, ET AL. : | |
|      **Defendants.** : | |
| : | |

## MEMORANDUM OPINION

**GOLDBERG, J.**                                                                                              October 27, 2022

      This police use-of-force case arises out of an incident between a train passenger and two Southeastern Pennsylvania Transportation Authority ("SEPTA") police officers. Plaintiff Keith Rawlings ("Plaintiff") brings claims under 42 U.S.C. § 1983 against SEPTA police officers Thomas Walsh ("Officer Walsh") and Anthony Capaldi ("Officer Capaldi") (collectively, "the Officers"). In October of 2017, the Officers approached Plaintiff as he was exiting a SEPTA train and accused him of matching the description of a suspect who had "jumped the turnstile" without paying the train fare. When Plaintiff fled from the Officers, they chased and ultimately tackled him to the ground, breaking his arm. Plaintiff asserts this incident was a violation of his right to be free from excessive force. He additionally brings a Monell claim against SEPTA and former SEPTA Police Chief Thomas Nestel ("Chief Nestel") for their alleged policies condoning the use of excessive force against fare evaders.

      Pending before me is a Motion for Summary Judgment filed on behalf of all Defendants. For the reasons outlined below, Defendants' Motion will be denied as to Plaintiff's excessive force

and punitive damages claims against Officers Walsh and Capaldi and granted as to Plaintiff's bystander liability claim and Monell claims against SEPTA and Chief Nestel.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Taken in the light most favorable to Plaintiff as the party opposing summary judgment, Plaintiff's evidence could establish the following:

- On October 13th, 2017, Plaintiff went to visit a friend's house who had just experienced a death in the family. Plaintiff considered the situation to be an emergency. He arrived at the Girard SEPTA station and tried to use his SEPTA KeyCard to access the Market-Frankford line, but the machine did not register his payment. Plaintiff had a KeyCard with a weekly TransPass that had been working properly the day before. Because there were no SEPTA employees available to take cash at the cashier's booth and a subway train was arriving, Plaintiff boarded the train without paying the fare. (Plaintiff's Statement of Disputed Material Facts in Response to Defendant's Motion for Summary Judgment ("PDMF") ¶¶ 22-25.)

- When Plaintiff arrived at the Allegheny train station, Officers Walsh and Capaldi approached him and accused him of "jumping the fare" because they believed he matched the description and photo of a fare evader they were looking for. Plaintiff explained that he had attempted to pay but the turnstile did not accept his payment. He also showed the Officers that he had enough cash with him to pay the fare. The Officers used an elevated tone and stated that they "got" him and did so before investigating or questioning him. The Officers then asked for Plaintiff's identification, and he gave them his wallet. Plaintiff continued to deny that he had evaded the fare and tried to explain the circumstances. (Id. at ¶¶ 26-29.)

- The Officers began running Plaintiff's identification through their system to determine if he had any outstanding warrants, as is their protocol. As the Officers did so, Plaintiff became nervous and afraid for his life because of recent stories that had been in the news about police brutality, such as the incidents involving Freddie Gray and Eric Garner. For that reason, he started to run away. The Officers chased after him, with Office Walsh trailing behind Plaintiff, and Officer Capaldi following behind. (Id. at ¶¶ 30-33.)

- Plaintiff led the Officers through the station and down two flights of stairs to a street level exit. When he reached the street level, Plaintiff stopped momentarily to kneel down and catch his breath. As he was kneeling, he was tackled from the left by both Officers. Both Officers were on top of him after he was tackled. There were no other police officers present. (Id. at ¶¶ 34-37.)

---

[1] In his response to the motion for summary judgment, Plaintiff conceded that his claim for unlawful seizure and all claims against a third SEPTA police officer, Officer Williams, should be dismissed.

- Officers Walsh and Capaldi broke Plaintiff's right arm when they tackled him, and one of the Officers "slammed" his head into a police vehicle. Plaintiff notified the Officers of his injury and they took him to the hospital for treatment. (Id. at ¶¶ 38-39; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, p. 8.)

- Plaintiff was charged with a summary offense as a result of the incident. (Id. at ¶ 42.)

- Although there was an outstanding warrant for Plaintiff's arrest on the day of the incident for absconding from parole, the Officers were not aware of this until after they tackled and handcuffed him. (Id. at ¶ 43.)

- Plaintiff offers evidence of SEPTA's policies with respect to police use of force on fare evaders. When Defendant Chief Nestel first became Chief of the SEPTA police, his priority was to reduce "Part One" crimes, which he identified as murder, rape, robbery, aggravated assault, burglary, and theft. He also believed in order to stop Part One crimes, SEPTA police should focus on fare evasion because fare evaders are "likely to engage in an activity that is either criminal or disorderly." Chief Nestel publicly stated that SEPTA would no longer tolerate fare evasion. As part of this focus, Chief Nestel promulgated SEPTA Police Directive 616, "Fare Evasion Response." The policy statement indicates that, "[a]n aggressive campaign will be utilized to address fare evasion throughout the system. Exceptional efforts will be extended in attempting to apprehend offenders . . . .". When Chief Nestel began running the department, the number of arrests (as opposed to citations) for fare evasion increased tenfold. (Id. at ¶¶ 4-14.)

- Chief Nestel acknowledged during his deposition that he was aware of an incident from 2015 in which a SEPTA police officer choked a man who was holding an 18-month-old baby because the man failed to pay a $2.25 fare. At a press conference about the incident, Chief Nestel stated, "[t]his is about us. I'm not going to change how someone in the public deals with the police. I have to change how the police deal with the public." He also stated at the press conference that the officer choked the man because he feared he would be disciplined if he simply let him go. He did not recall disciplining the officer for the choking incident. (Id. at ¶¶ 15-18.)

- Plaintiff further offers evidence of three other cases in which passengers have sued SEPTA police officers for use of excessive force in response to alleged fare evasion incidents. Despite these incidents, the fare evasion policy has not been changed. (Id. at ¶¶ 19-21.)

Based on the above facts, Plaintiff brings claims against Officers Walsh and Capaldi under 42 U.S.C. § 1983 for use of excessive force and bystander liability in violation of his Fourth Amendment right to be free from unreasonable seizures. Plaintiff alleges that the Officers' conduct in tackling him to the ground was objectively unreasonable in light of the circumstances and that it amounted to a seizure conducted with excessive force. Plaintiff further asserts that SEPTA and

3

Chief Nestel are liable under Monell because the Officers' actions were the result of SEPTA's custom or policy of condoning the use of excessive force on fare evaders.

The Officers respond that the uncontested material facts reflect that Plaintiff cannot prove they used any, let alone excessive force because both Officers testified in depositions that several other Philadelphia police officers were the ones who tackled the plaintiff, not them. In the alternative, the Officers argue that their use of force was reasonable, and for that reason, they are entitled to qualified immunity. Because there is no underlying constitutional violation, the Officers assert that Plaintiff's bystander liability claim likewise fails. With respect to the Monell claim, Chief Nestel and SEPTA argue that even assuming Plaintiff could establish an underlying constitutional violation, his claim that SEPTA had a custom or policy of using excessive force against fare evaders is not supported by the record evidence.

## II.    LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a verdict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

4

The movant "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

### III. ANALYSIS

42 U.S.C. § 1983 "provides a remedy for the violation of rights created by federal law." Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). To make out a claim under § 1983, a plaintiff must demonstrate: "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." Id. Defendants do not contest that the Officers were acting under color of state law when the incident occurred. Thus, I must determine whether a jury could find that the Officers deprived Plaintiff of a federal right.

In addition, I must analyze whether the Officers are entitled to qualified immunity. A defendant is not liable under § 1983 unless the defendant "violated a … right that was 'clearly established' at the time of the challenged conduct." Plumhoff v. Rickard, 572 U.S. 765, 778-79

5

(2014).  "In other words, existing precedent must have placed" it "beyond debate" that the defendant's conduct was unlawful.  See id. at 779.

The Supreme Court "ha[s] repeatedly told courts not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Id. Thus, "[i]t is only when both the theory of liability and its application to the established facts are sufficiently plain that the legal question of liability is beyond legitimate debate and a plaintiff can defeat a qualified immunity defense." Sauers v. Borough of Nesquehoning, 905 F.3d 711, 719 (3d Cir. 2018).

"[I]n reviewing a motion for summary judgment on the basis of qualified immunity, normal principles of summary judgment … apply, and any disputes of fact must be resolved in favor of the plaintiff." Est. of Smith v. Marasco, 430 F.3d 140, 148 n.3 (3d Cir. 2005).  When qualified immunity depends on disputed issues of fact, the issues must be determined by a jury. Est. of Smith v. City of Wilmington, No. 04-cv-1254, 2007 WL 879717, at *9 (D. Del. Mar. 22, 2007), aff'd, 317 F. Appx. 237 (3d Cir. 2009).  Accordingly, I must analyze whether, taking the facts in the light most favorable to Plaintiff, and the law as it was clearly established at the time of the alleged wrongdoing, a reasonable jury could find that the Officers violated Plaintiff's constitutional rights.  See Est. of Smith, 430 F.3d at n.3.

### A.     Excessive Force

Plaintiff must first show that the Officers' conduct in tackling him to the ground was "unreasonable."  Abraham, 183 F.3d at 288.  In addition, for Plaintiff to overcome the Officers' qualified immunity defense, clearly established law at the time of the alleged constitutional wrong must have put the excessiveness of the force used "beyond debate." Mullenix, 577 U.S. at 12.

The Fourth Amendment prohibits a police officer from using excessive force to effectuate an arrest. Graham v. Connor, 490 U.S. 386, 394 (1989). Determining whether force is excessive is a fact-sensitive inquiry that requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396. The Third Circuit analyzes the appropriate level of force through the "Sharrar factors," which include, among other considerations, (1) the severity of the crime for which the officer is conducting an arrest; (2) the danger the arrestee may pose to the officer and others; (3) whether the arrestee is actively resisting arrest or attempting to evade arrest by flight; (4) the duration of the action; (5) the possibility that the arrestee may be armed; and (6) the number of persons with whom the officers must contend at one time. Sharrar v. Felsing, 128 F.3d 810, 821-22 (3d Cir. 1997).

Initially, the Officers contend that there is no evidence that they used any force against Plaintiff, much less excessive force. Rather, the Officers posit that it was Philadelphia police officers who apprehended Plaintiff when he reached the street level exit of the station, and this is supported by "the Officers' consistent and undisputed testimony" confirming this fact. (Def. Mot. at p. 10-11). The Officers characterize Plaintiff's contention that they tackled him as an "assumption" and mere "speculation" because Plaintiff did not observe either of the officers immediately before he was tackled. (Id.) The Officers conclude that they cannot be held liable for excessive force when there is no evidence that they used force at all.

Plaintiff responds that there is a genuine dispute of material fact regarding who tackled him, and there is ample circumstantial evidence that Officers Walsh and Capaldi were the individuals responsible. See PDMF ¶ 36 (citing Defendants' Exhibit D at 86:17-88:1 in which Plaintiff testified that the officers who tackled him were "always together," and that Defendant

7

Capaldi was "the first one off of me" while Plaintiff was on the ground after being tackled, and that "I felt that weight of two people on me"). Plaintiff also notes that Philadelphia Police Department reports related to the incident only list SEPTA police officers as having been present. (Id. ¶ 37.) Given these facts of record, a dispute exists as to whether the Officers tackled the Plaintiff and caused his injuries. Thus, I cannot grant Defendants' motion on this basis.

The Officers next argue that even if they used force against Plaintiff, the force used was objectively reasonable, and if not, they are entitled to qualified immunity. The Third Circuit has held that "an unarmed individual who is not suspected of a serious crime—including one who is verbally uncooperative or passively resists the police—has the right not to be subjected to physical force such as being grabbed, dragged, or taken down." El v. City of Pittsburgh, 975 F.3d 327, 340 (3d Cir. 2020). Brown v. Evans is instructive on this point. No. 21-cv-651, 2021 WL 4973630, at *1 (D. Del. Oct. 25, 2021). In Brown, the police received an anonymous tip that there was drug dealing going on at plaintiff's home. Id. Officers went to the house and found the plaintiff sitting on a dirt bike in his driveway. Id. As they approached him, he began moving his bike back into his driveway despite their orders to stop and dismount the bike. Id. The officers then "hauled" the plaintiff off his bike and "dragged him to the ground," while resulted in a struggle that left the plaintiff with cuts and bruises. Id. The district court denied defendants' motion to dismiss plaintiff's excessive force claim, finding that his right not to be "manhandled" by the police when he was not suspected of a serious crime was clearly established, and the officers were therefore not entitled to qualified immunity. Id. at *4.

With Brown in mind and applying the Sharrar factors, I find that a reasonable jury could conclude the Officers' use of force was excessive and that Plaintiff's right to be free from such force was clearly established. Facts viewed in the light most favorable to Plaintiff could establish

that Plaintiff was being cited for a minor summary offense for failing to pay a $2 train fare. These facts could also show that there was no basis for the Officers to believe that Plaintiff was armed or dangerous. Although Plaintiff had an outstanding warrant for his arrest at the time, the Officers were not aware of the warrant until after he was apprehended. And while Plaintiff did flee from the scene, this fact alone does not necessarily mean that he posed a threat to them or anyone else. Plaintiff was also by himself and was therefore outnumbered two to one. The incident additionally resulted in significant injury to Plaintiff, as his arm was broken.

The Officers urge that they were entitled to assume that the Plaintiff was armed, dangerous, and potentially had outstanding warrants for his arrest because he admitted to not paying the train fare and then fled the scene. I disagree. There is no evidence to suggest that Plaintiff posed a safety risk to anyone, or that he was armed. Like the plaintiff in Brown, Plaintiff was not suspected of a serious crime, but rather was simply being cited for a summary offense. And while his resistance to police was more active than the resistance the defendants were faced with in Brown, a fact finder could conclude that his right to not be tackled to the ground over a $2 train fare was clearly established and the Officers' conduct was objectively unreasonable.

At minimum, material questions of fact exist as to whether the Officers reasonably believed Plaintiff's flight posed a risk to them or others, which should be resolved by a jury. Est. of Smith v. City of Wilmington, 2007 WL 879717 at *9 ("[T]he defendants contend that they reasonably believed Smith's flight posed a risk to others. While a jury may ultimately accept this contention, it also may reject the defendants' version of the events and accept the plaintiffs' version, which is that Smith posed no risk to others."). And the potential danger Plaintiff posed to others is not the only fact in dispute that is relevant to the reasonableness inquiry. Plaintiff also alleges that after he was tackled to the ground, one of the Officers "slammed" his head into a police vehicle and he

was "aggressively handcuffed." Defendants do not explicitly deny this but suggest that the allegations do not preclude summary judgment because Plaintiff did not allege that his injuries resulted from these actions, or that he sought medical treatment for them. Whether Plaintiff sought medical treatment for the specific injuries he sustained from this alleged conduct is irrelevant for purposes of the qualified immunity analysis. It is disputed whether one of the Officers slammed Plaintiff's head into a police vehicle and aggressively handcuffed him, and these facts are relevant to the reasonableness of the Officers' conduct. And as I already explained, these factual disputes must be developed at trial and determined by a jury.

For the foregoing reasons, summary judgment as to the excessive force claim will be denied.

### B.     Bystander Liability

Plaintiff next claims that the Officers each failed to intervene in the others' use of excessive force against him. The Officers argue that they did not have a reasonable opportunity to intervene in the others' use of force because the incident lasted just minutes.

"If a police officer . . .fails or refuses to intervene when a constitutional violation. . . takes place in his presence, the officer is directly liable under Section 1983." Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002) (quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)). Police officers have a duty to "take reasonable steps to protect a victim from another officer's use of excessive force." Bush v. Renegar, No. 18-cv-327, 2020 WL 5408065, at *9 (E.D. Pa. Sept. 9, 2020) (internal quotations omitted). However, the officer must have had a realistic and reasonable opportunity to intervene in order to be held liable. Smith, 293 F.3d at 651. Courts have found a genuine issue of fact may exist regarding a reasonable opportunity to intervene when the incident lasts about fifteen minutes, Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995), or where

the event unfolds in multiple stages, Smith, 293 F.3d at 644, 650. On the other hand, an incident may be so brief that, even viewed in the light most favorable to the plaintiff, the defendant could not be found to have had a reasonable opportunity to intervene. El, 975 F.3d at 335.

The Officers argue that even if Plaintiff can establish that they used excessive force, there is no evidence that either of the Officers had an opportunity to intervene in the others' conduct. The Officers highlight that the incident was brief – with the initial encounter before the Plaintiff fled lasting approximately five minutes, and the subsequent pursuit of Plaintiff taking just minutes. Plaintiff responds that he testified to seeing the Officers at the top of two flights of stairs when he stopped to catch his breath and looked behind him. Therefore, he contends that the Officers had "the entire time they were coming down the stairs and also the time it took them to cross the remaining distance" to intervene with the other's tackling of Plaintiff.

I find that no reasonable jury could conclude that the Officers had a reasonable opportunity to intervene in each other's alleged use of force. The undisputed facts reflect that the time frame Plaintiff cites is simply too short, especially considering that the Officers were running at the time and Plaintiff had just briefly knelt down to catch his breath. The question is not whether they had an opportunity to intervene in the entire incident, but in the other Officer's specific use of force. El, 975 F.3d at 336. Here, the use of force was tackling the Plaintiff to the ground, which Plaintiff alleges the Officers did at almost the exact same time. Thus, the Officers would have had a few split seconds, if that, to intervene in the other's use of force. That is not a realistic amount of time such that they should have been expected to intervene. For these reasons, I will grant Defendants' motion as to the bystander liability claim.

C.   **Municipal Liability**

Plaintiff lastly seeks to hold SEPTA and Defendant Former Chief Nestel liable for the Officers' allegedly unconstitutional conduct, arguing that they acted pursuant to a policy of condoning the use of excessive force against fare evaders.

"When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). "A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law." Id. (alterations and quotation marks omitted). "Custom … may also be established by evidence of knowledge and acquiescence." Id. In particular, "[i]nadequate police training—or the absence of training altogether—may be the basis for a § 1983 suit if the deficient training amounts to 'deliberate indifference' to the rights of the person aggrieved." Bellmon v. City of Philadelphia, 895 F. Supp. 2d 659, 663 (E.D. Pa. 2012).

Plaintiff points to several sources of evidence to support his municipal liability claim. First, he cites SEPTA's Police Directive 616, entitled "Fare Evasion Response." This policy statement, promulgated by Chief Nestel, indicates that, "[a]n aggressive campaign will be utilized to address fare evasion throughout the system[,]" and "[e]xceptional efforts will be extended in attempting to apprehend offenders . . . ." (PDMF ¶ 12.) Plaintiff notes that after Chief Nestel took command of the SEPTA police, arrests for fare evasion increased tenfold. (Id. ¶ 14.) Plaintiff additionally cites three excessive force lawsuits that were filed against SEPTA and/or the City between 2013 – 2015 that were eventually settled.[2] Lastly, Plaintiff points to a June 2015 incident in which a

---

2    See 2:15-cv-3731; 2:15-cv-2995; 2:16-cv-2074.

SEPTA police officer choked a man holding an 18-month-old child because he did not pay his train fare. After the June 2015 incident, Defendant Chief Nestel held a press conference in which he stated: "this is about us . . . I have to change how the police deal with the public." (PDMF at ¶¶ 15-18.) Plaintiff asserts that the directive combined with the three lawsuits and the June 2015 incident sufficiently demonstrate that SEPTA had a policy of using excessive force on fare evaders and that policy motivated the Officers to deprive Plaintiff of his rights.

Courts within the Eastern District have granted summary judgment where Monell claims were based on a handful of excessive force lawsuits that were either settled or resulted in jury verdicts for the defendants, and/or articles about previous incidents involving alleged use of excessive force. See, e.g., Pharaoh v. Dewees, No. 14-cv-3116, 2016 WL 2593842, at *7 (E.D. Pa. May 4, 2016) (granting summary judgment where plaintiff based his Monell claim on five excessive force lawsuits – two that resulted in jury verdicts for the defendants and three that were settled – because the lawsuits did not "establish that [the officer's] actions constituted a pattern of using excessive force."); Brown v. Ridley Twp., No. 14-cv-5874, 2015 WL 568640, at *6 (E.D. Pa. Feb. 10, 2015) (summary judgment granted where plaintiff relied on several lawsuits and newspaper articles detailing police officers' use of tasers in specific incidents because those factual allegations did not demonstrate that the defendant municipality was "aware of any similar taser-related conduct by their police officers and then failed to take appropriate precautions.").

Plaintiff's evidence of SEPTA's policy or custom of condoning excessive force tactics in fare evasion situations is insufficient to survive a motion for summary judgment. While the fare evasion response directive emphasized that SEPTA would implement an aggressive campaign to address fare evasion, it did not suggest that officers could or should use any type of force, let alone excessive force to achieve that objective. Furthermore, like the evidence relied upon in Pharoh

13

and Brown v. Ridley Twp., a handful of lawsuits that were settled and one alleged incident from 2015 do not establish a pattern of using excessive force.[3] The lawsuits were not decided on the merits, so their evidentiary value is limited. Similarly, I have very little context for the circumstances surrounding the June 2015 incident. And for that same reason, Plaintiff has not sufficiently demonstrated a failure to train or deliberate indifference claim. The three lawsuits and one incident do not demonstrate a "pattern of violations" as required for a failure to train claim.

I will therefore grant summary judgment to SEPTA and Chief Nestel on Plaintiff's claims against them.

### D. Punitive Damages

Plaintiff lastly seeks punitive damages. Punitive damages may be awarded in Section 1983 cases "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983).

As an initial note, punitive damages cannot be recovered against a municipality or officers acting in their official capacity. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 263 (1981). However, punitive damages may be assessed against Officers Walsh and Capaldi in their individual capacities. As discussed throughout this opinion, it is alleged that the Officers tackled Plaintiff to the ground for evading a $2 train fare, broke his arm in the process, and slammed his head into a police vehicle. Whether these allegations amount to "reckless or callous indifference" to his federal rights is a question more appropriately determined by a jury. See Southersby Dev.

---

[3] Plaintiff cites a case from the Eastern District of California in which the court found that evidence of three prior incidents of alleged excessive force that resulted in settlements was sufficient to support a Monell claim. Est. of Osuna v. Cnty. of Stanislaus, 392 F. Supp. 3d 1162, 1173–74 (E.D. Cal. 2019). Importantly, this case was at the motion to dismiss stage, and more is required at summary judgment. Furthermore, I find the cases within this district cited above to be more persuasive.

Corp. v. Borough of Jefferson Hills, 852 F. Supp.2d 616, 637 (W.D. Pa. 2012) (noting that "whether or not the plaintiff is entitled to punitive damages is typically a question of fact for the jury to resolve.").

## IV. CONCLUSION

For the foregoing reasons, I find that Plaintiff may proceed to a jury with his excessive force and punitive damages claims against Officers Walsh and Capaldi, but his claim for bystander liability should be dismissed. I also find that his claims against SEPTA and Chief Nestel should be dismissed.

An appropriate Order follows.